## SNYDER ET UX. *v.* BRADEN.

DURESS.—*Fraud.—Promissory Note.—Mortgage.—Foreclosure.*—The fact that a creditor, by means of threats, made by him to his debtor, that he will resort to legal proceedings to collect a valid debt, owing from the latter to the former, induces the debtor to execute to him a promissory note therefor, and a mortgage on real estate to secure its payment, constitutes neither duress nor fraud.

PRACTICE.—*Jury.—Promissory Note.*—In an action upon a promissory note, the court, in its discretion, may permit such note to be attached to the complaint as an exhibit, and allow the same to be sent to the jury, after they have retired to consult as to their verdict.

SAME.—*Verdict.*—The court may allow a blank form of a verdict to be prepared by a party to an action, and sent to the jury for their use.

EVIDENCE.—*Promissory Note.—Admissions of Party.—Duress.—Fraud.—Mistake.*—In an action upon the last of several promissory notes, given in the same transaction, where the defence relied upon is duress, fraud or mistake in its execution, a written confession, under oath, by the defendant, of the execution and justness of another of such notes, filed by him in an action thereon against him, is admissible in evidence.

INTEREST.—*Contract not in Writing.—Recoupment.—Statutes Construed.*—By section 5 of the act of March 7th, 1861, 2 G. & H., p. 656, and by the act of March 9th, 1867, 1 R. S. 1876, p. 599, concerning interest on money,

all interest contracted for in excess of six per cent. per annum, by a contract not in writing, may be recouped.

From the Montgomery Circuit Court.

*P. S. Kennedy, W. T. Brush, M. D. White* and *E. C. Snyder*, for appellants.

*L. Wallace* and *G. D. Hurley*, for appellee.

Perkins, J.—Complaint to foreclose a mortgage, and to recover for money paid for the defendant. The complaint is against Andrew Snyder and Elizabeth, his wife. The defendant Andrew answered in six paragraphs, and the defendant Elizabeth in two. Demurrers were sustained to the fifth and sixth paragraphs of Andrew's answer, and to the second of Elizabeth's.

Issues were formed on the remaining paragraphs. Trial by jury. Verdict against both defendants, on the paragraph of complaint for the foreclosure of the mortgage, and against the defendant Andrew, on the second paragraph, that for money paid.

Judgment, over a motion for a new trial, on the verdict.

The grounds alleged in the motion for a new trial were:

"1. Verdict unsustained by evidence, and contrary to law.

"2. Excessive damages.

"3. Errors of law, occurring at the trial and excepted to at the time, in this: that the court permitted the notes sued on to be sent to the jury, and permitted the plaintiff's attorneys to mark said notes as exhibits in the cause, after the jury had retired, and permitted the plaintiff, over the defendants' objection, to prepare the form of a verdict, and send the same to the jury, with blanks left for the jury to fill, and permitted the plaintiff to give in evidence the cognovit confessing a judgment on a note at the April term, 1875, of this court; said note having been executed at the same time as the notes herein sued on."

The assignment of errors in this court is as follows:

1st. In overruling the motion for a new trial;

2d. In sustaining the demurrer to the second paragraph of the answer of defendant Elizabeth;

3d. In sustaining the demurrer to the fifth paragraph of the answer of defendant Andrew; and,

4th. In sustaining the demurrer to the sixth paragraph of the answer of defendant Andrew.

We will consider these assignments of error, but not in the order of assignment.

First, of the third assignment.

We copy the material portion of the fifth paragraph of answer, to which a demurrer was sustained.

It is: " That long before and at the time of the execution of said notes, the defendant Andrew J. Snyder was laboring under great distress and anxiety of mind, owing to financial, business and other embarrassments, and, in consequence thereof, was not in a condition to properly attend to business; that the plaintiff prepared said notes, and for several weeks before their execution, and at various times, urged said Snyder to sign them; that said Snyder as often refused, but that said plaintiff, by artifice and cunning, and by taking an undue advantage of the defendant's condition and situation, in this, to wit, by using threats of throwing said Snyder into bankruptcy, by falsely and fraudulently representing that all of his, Snyder's, creditors were anxious that proceedings in bankruptcy should be instituted against him, and by representing that a petition in bankruptcy was already drawn up, and that it would be filed at Indianapolis unless notes and mortgage were signed without delay, he so far got control of the will and judgment of said Snyder, that he, said Snyder, at the time of signing said notes and mortgage, was not in the exercise and free use of his judgment and will, but that the signing aforesaid was the consequence of the im-

proper and fraudulent practice resorted to by said plaintiff to obtain his said signature. Wherefore," etc.

The sixth paragraph of answer of said Andrew did not differ materially from the fifth; and the second paragraph of the answer of Mrs. Elizabeth Snyder alleges that she signed the notes and mortgage at her husband's solicitation, for fear of serious consquences resulting to him if she did not, on account of the state of distraction into which his pecuniary embarrassments, and the pressure upon him of the plaintiff to sign the notes and mortgage in question, had driven him.

There were other paragraphs of answer, upon which issues were formed and tried, under which the consideration of the notes and mortgage could be and was inquired into.

It is claimed that the paragraphs to which demurrers were sustained show duress and fraud, not in the transactions out of which the indebtedness arose, but in the obtaining of the notes and mortgage for that indebtedness.

A certain degree of duress may excuse what would otherwise be a criminal act. Bicknell Crim. Prac. 13.

A less degree may be cause for avoiding a contract. But the difficult question in the case is, What constitutes duress of either degree? What is claimed to be such in this case is the giving by a creditor to his debtor in distress from pecuniary embarrassment, the alternative of being sued in a legal mode for the debt, or giving notes and a mortgage upon property owned by him to secure it. This is neither legal duress of either degree, nor fraud. To threaten a debtor with a suit, legally commenced and prosecuted, to recover the debt, if he does not secure it, is neither duress nor fraud, and this is all that was done in this case. We need not extend the discussion of this topic. The law, so far as applicable to this case, is well settled. 1 Parsons Contracts, 392; 1 Cooley Bl. Com. 131; *Richardson* v. *Hittle*, 31 Ind. 119; *The Lafayette, etc., R. R. Co.* v. *Pattison*, 41 Ind. 312.

The remaining error assigned is the overruling of a motion for a new trial. We think there was no error in overruling the motion, so far as it rested on the third ground alleged. It was in the discretion of the court to permit the jury to take the notes sued on to their room, to permit the attorney to mark them as exhibits, and to furnish the jury with skeleton forms of a verdict. And, as to the admission of the cognovit in evidence, in our opinion it was not error.

The plaintiff and defendant had, for upwards of nine years, been doing a large business with each other. They had a settlement between themselves of that business, and, on that settlement, it appeared that a large balance was due to the plaintiff, Braden, and on the 1st day of January, 1874, the defendant Snyder executed notes for the balance found due on that settlement, three in number, each for six thousand dollars.

On the 25th day of August, 1874, about eight months after said notes were given, the defendant confessed judgment on the one of those three notes first due, by a cognovit, with an oath appended that the note was just, while in the present suit the defendant is attempting to impeach that settlement as erroneous.

It seems to us that the verified cognovit was an item of evidence tending to prove the correctness of the settlement.

The evidence is in the record. The plaintiff rested his case on the notes and mortgage. The defendant rested his defence alone upon the testimony of the plaintiff, Braden.

One of the issues in the cause presented for decision is the question whether the facts made a case under our statutes for the recoupment of illegal interest paid. The statute of 1861 fixed the rate of interest at not exceeding six per cent. The statute contained this section :

"Sec. 5. If a greater rate of interest than is hereinbefore allowed shall be contracted for, or received or re-

served, the contract shall not therefore be void, but if in any action on such contract, proof be made that interest at a rate exceeding six dollars a year on one hundred dollars has been directly or indirectly contracted for, or taken or reserved, the plaintiff shall recover only his principal with six per cent. interest, and he shall also recover costs, and if 'a greater rate of interest than six dollars a year for one hundred dollars shall have been paid thereon, whether in advance or not, judgment shall be rendered only for the amount of principal, deducting the excess of interest thus paid, at the time paid.'" 2 G. & H., p. 657.

In 1867 the following act was passed:

" SEC. 1. *Be it enacted by the General Assembly of the State of Indiana,* That interest upon the loan or forbearance of money, goods or things in action, shall be at the rate of six dollars a year upon one hundred dollars, and no greater rate of interest shall be taken, directly or indirectly, unless the agreement to pay a higher rate of interest be made in writing, and signed by the party to be charged; but such rate of interest shall in no case exceed the rate of ten dollars a year on one hundred dollars; but it may be taken yearly, or for any shorter period, in advance.

" SEC. 2. All interest exceeding the rate of ten per centum per annum shall be deemed usurious and illegal, as to the excess only, and in any action upon a contract affected by such usury, such excess may be recouped by the defendant whenever it has been reserved or paid before the bringing of the suit: *Provided,* That nothing herein contained shall affect the loan of public funds, nor interest on purchase-money of canal, college, school or saline funds [lands?]." 1 R. S. 1876, p. 599.

Construing these two statutes together, Is the excess over six per cent. recoverable back as usury, where there is no contract in writing, and the excess over ten per cent. where there is such contract, or is the excess over

ten per cent. only, recoverable back in all cases? Counsel for appellee concede that the excess over six per cent. is recoverable back on loans, where the contract is not in writing. We quote from their brief: "We say frankly, if the interest charged by the appellee, and allowed him in settlement, was interest upon a loan, then the damages assessed were excessive to the amount of such unlawful interest. On the other hand, if the ten per cent. charged and allowed was part of the consideration, in the way of compensation for the various services the appellee agreed to and did render appellant upon his request, and as per contract, then the damages assessed were not excessive."

We turn to the testimony of Braden to ascertain the facts. It follows:

"I agreed to take his" [Snyder's] "business, and go on with him as with the old firm. The terms" on which "the business was carried on by that firm were these: Snyder paid them interest upon money advanced him by them, at the rate of ten per cent., also two and a half per cent. commission for procuring and advancing funds before delivery of flour, and a commission of ten cents per barrel for procuring cars and getting rates of transportation on shipping flour. I agreed to go on with Snyder, upon the same terms. He requested me to do so. When Mr. Snyder came to me with this request, it was known to him, as well as to me, that I didn't have capital sufficient to carry on the business as he wished, and that I would have to borrow the money for the purpose of making his advances, and to do that I would have to pay the rates usually paid for money, which was known to be ten per cent. It was therefore agreed and understood between us, that I would have to charge him for my advances to him, at the rate of ten per centum, which was made to remunerate me for what I paid for the money advanced. These advances, as understood by us, were not, in any sense, loans, but were furnished to Snyder to buy wheat, which, when manufactured into flour, he was to deliver

to me to sell or ship for him, and out of the proceeds of said sales or shipments I was to be paid my advances and charges. The money I was to pay him personally or on his order. For the procuring this money upon my credit, paying it out in advance of the delivery of flour, out of which I was to be reimbursed, he agreed to pay me a commission of two and a half per cent. Upon sales of flour made by me here at home, he was to pay me a commission of two and a half per cent. For the procuring of cars and freight rates, and attending to the shipping of the flour and the collection, he was to pay me ten cents per barrel. I had about $7,000 of money of my own when our business commenced. The first year of the business, ending July 31st, 1865 (I made that the end of the year), commenced with $1,505.40 to my credit.

" That amount was made up of such items as : First, the amount paid out on the debit side for Mr. Snyder. Second, the commission for sales. Third, the commission for advances. Fourth, the ten cents per barrel for shipping. Fifth, the balance of interest or difference between the amount paid out by me for money to make advances with, and the interest which was allowed him upon proceeds of sales during the current year.

" To make an explanation of this balance of interest applicable to all the years the business lasted, I would say : By the agreement between us, while I was to have and receive ten per cent. interest upon the items of advances, he was to have, and be allowed, a credit of ten per cent. interest upon each item of money collected as proceeds of sales. The interest account, for and against, thus kept, was to be balanced at the end of the year, and the excess, according to the side it fell on, was to be a charge, or credit, in the settlement. On my side, the interest was to commence running from the date of each advance; on his side, the interest was to commence running from the date of the receipt of each item of the proceeds of sales. The excess of interest due me at the end of the first year

(July 31st, 1865), in excess of the amount of interest due Snyder, was $229.90. The total balance due me on account, at the end of the first year, was $3,764.88. The commission on sales that year, $45.63. The commission for shipping, $248.20. The difference between the amount I paid out to Snyder on his order, and the amount I received from sales of flour he delivered to me, went to make up the total balance due me at the end of the first year. This balance was carried forward, and constituted the first item on the debit side at the commencement of the next year, and interest was charged thereon to the end of the year, and the operation was repeated at the end of each year.

" The money I advanced to Snyder under the agreement between us, I procured myself, in all instances. He was not known in the transaction. The effect was, that interest on the sums advanced were paid through me.

" All the shipping done in the business was in my name, not Snyder's. In every instance I advanced him money before I got the flour, and sometimes I drew against the bills of lading. Snyder had nothing to do with money advanced on bills of lading. They were moneys received by me. I gave him credit for the proceeds, and I didn't charge him interest on those amounts, but credited him with interest at the rate stated. At the end of the second year the balance of interest due me was $464.12. At the end of each year the balance found due me, not being paid, was carried forward on the account for the ensuing year. Total balance due me for the second year, ending July 31st, 1866, was $6,735.32. Balance of interest due me at the end of the third year was $960.20. Total balance, $13,486.41. This third year I borrowed all the money advanced to him; he already had all my capital. This year Snyder laid out money in building a mill.

" Balance of interest due me at the end of the fourth year (1868) was $1,396.20; total balance due me from Snyder,

$11,660.81; balance of interest due me at the end of fifth year (1869) was $1,598.73; total balance due me at the end of that year, $15,122.30; total balance of interest due me July 31st, 1870, $1,423.42; total balance due that year, $15,342.66; total balance of interest due me for the year ending July 31st, 1871, was $1,777.74; total balance due me that year, $17,419.45; total balance of interest due me for the year ending July 31st, 1872, was $1,683.75; total balance due on that year, $16,083.47; total balance of interest due me for year ending July 31st, 1873, was $1,540.69; total balance due me that year, $17,372.01. In January, 1874, he executed the notes. The settlement was had between us, July 31st, 1873; and he executed three notes to me on the day stated, that is to say, on January 1st, 1874, and ten days after that he executed the mortgage to secure two of the notes. The interest on the five months' interval between the settlement and the execution of the notes was counted in at ten per cent.; in all, $18,000."

Upon cross-examination, the witness testified as follows, to wit:

"I began the business individually with Snyder, in June, 1864. Snyder requested me to take charge of his business. The terms were the same as he had had theretofore with the firm of Lee, Gilkey & Co. That firm originally charged him six cents per barrel for shipping flour, but at his request it was raised by them to ten cents per barrel. After I began with him I fixed the end of each year on the 31st of July, that being about the time millers wound up with the old crops and began with the new. On that day, every year, beginning with the first one and ending with 1873, Snyder and I had a settlement, and for the purpose of the settlement I drew up and furnished to him a detailed statement of all transactions had between us during the year, being a complete itemized account, debit and credit. Sometimes I gave him the account, sometimes I sent it to him. The settle-

ments were had at my office. On the debit side of such accounts I entered amounts of cash paid Snyder in person, amounts paid out on his orders, amount of difference due on interest paid, charges for commissions on sales and shipping, and procuring money to advance. On the credit side, I set out and showed the proceeds derived from sales, whether made by me at home or on shipments. Occasionally Snyder paid in money got from sales of flour made by him here in Crawfordsville. As to interest, the understanding was, that money would cost ten per cent., as it was mentioned he knew that I did not have capital enough of my own to carry on the business, and that I couldn't procure money at a less rate than ten per cent. So, to make the matter equitable, it was agreed between us that I would charge him ten per cent. interest upon advances, and give him credit for interest on proceeds of sales at the same rate, which I did in every instance. The precise understanding was, that he was to owe me at the end of the year, on account of interest, the balance that would appear upon account to be due to me, if there was such balance. On the 31st of July, 1865, the balance of interest charged Snyder was $229.90; 31st July, 1866, balance interest charged Snyder was $464.12; 31st July, 1867, balance interest charged Snyder was $960.20. This year, like those preceding, we had a settlement on account rendered. He had then, and at all times, full liberty to inspect my books and read all my correspondence on account of sales. Once, I remember, he was enabled by my accounts to discover an error in his accounts against a third party. He never found fault with my accounts as presented. The account I made out for the settlement was always furnished him by copy for inspection and correction, if he had correction to make. July 31st, 1868, balance of interest charged Snyder was $1,396.20. This year we had a settlement also, and he endorsed, at the foot of the account, the certificate in these words:

" ' I hereby certify and acknowledge that the within account is just and correct.              A. J. SNYDER.

" ' August 15th, 1868.' "

It seems to us very clear, that the appellee charged Snyder ten per cent. interest for the use of money where there was no contract in writing, and that the excess may be recouped under the statute. The record before us does not show the amount of money upon which such charge was made. This must be determined upon another trial.

The judgment is reversed, with costs, and the cause is remanded for a new trial, in accordance with this opinion.